**UNITED STATES of America, Appellee,**

v.

**Richard BARRY, Appellant.**

**No. 1083, Docket 75–1060.**

United States Court of Appeals, Second Circuit.

Argued June 4, 1975.

Decided June 18, 1975.

Richard M. Rittenband, West Hartford, Conn., for appellant.

Michael Hartmere, Asst. U. S. Atty., D. Conn. (Peter C. Dorsey, U. S. Atty., for D. Conn., on the brief), for appellee.

Before KAUFMAN, Chief Judge, and SMITH and ANDERSON, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Although jurors are far less sensitive than computers to nuances in instruction, an erroneous charge by a trial judge may affect the jury in unaccountable ways and, in some instances, a defendant may be deprived of vital procedural safeguards. Exactly what transpired in the jury room where Barry's peers found him guilty of conspiring to distribute amphetamines will never be known. But the district court's failure to charge the jury as required by 18 U.S.C. § 3501(a) regarding the voluntariness of admissions Barry made to Drug Enforcement Administration agents raises the likelihood that the jury was led astray and, accordingly, requires a new trial.

A brief narration of the facts underlying Barry's conviction will permit us to weigh the error in the instructions more meaningfully. On July 12, 1973, John Albano, Richard Windus and Russell Thomas gathered at the corner of Kelsey and East Streets in New Britain, Connecticut. The latter two had agreed to supply Albano with four ounces of amphetamine ("speed") for $720, although they doubtless would have made the price prohibitive had they known that Albano was an agent of the DEA. After taking Albano's money, the two men drove a short distance to 16 Whitman Street. There special agent Terrence Sprankle, parked nearby in a green Ford van, saw Thomas enter the six-apartment building where Barry lived, while Windus waited outside. Fifteen minutes later Windus and Thomas returned empty-handed to the corner of Kelsey and East, and reported to Albano that the "connection" did not have the drug available.

The identical procedure was repeated with more success five days later on July 17. Thomas and Windus met Albano on the same corner, then drove alone to Whitman Street where agent Sprankle, again concealed in a green van, awaited their arrival. Sprankle had been requested to leave his previously occupied position in front of a fire hydrant near 16 Whitman Street by Barry and his brother-in-law. Nevertheless, he remained close by, and saw Thomas again enter the apartment building. Moments later Thomas rejoined Windus, and the two returned to Albano, this time delivering four ounces of "speed."

On July 31, 1973, Albano again met Thomas and Windus at the usual location. Albano tried to persuade them to take him to their supplier's house, but was told the connection was "paranoid" about the green van and, apparently, was accepting fewer social calls. Shortly thereafter Sprankle again observed Thomas on Whitman Street. The couriers eventually drove back to Kelsey and East, and presented Albano with eleven ounces of amphetamines.

Albano rather unceremoniously rewarded their labors by arresting Windus and Thomas. An indictment was returned against Barry on November 16, 1973, and, on November 29, he was arrested and taken to an interrogation room in the Federal Building. There Albano and Sprankle, along with two other agents, questioned him for some two hours. Albano later testified that during the questioning Barry admitted selling amphetamine to Thomas, but refused to name his own supplier, with whom he intended to have future dealings. It was this confession which engendered the controversy leading to this appeal.

At Barry's two-day trial Windus and Thomas, who were awaiting sentence after pleading guilty to distribution of amphetamines, testified for the Government along with Albano and Sprankle. When Albano was asked about Barry's post-arrest admissions, Barry moved for suppression.

The jury was excused, and Barry testified that he had been refused permission to call his lawyer despite repeated requests. He also claimed that the statements had been extracted by means of verbal threats and physical intimidation.[1] The district court concluded that Barry had elected to speak without counsel, and denied the motion.

Upon the conclusion of this hearing the jury returned to the courtroom and Albano then related Barry's statements. No instruction was given to the jury at that time concerning the issue of voluntariness. Barry subsequently testified before the jury to his version of the interrogation. In his requests to charge submitted to Judge Blumenfeld, Barry asked the judge to instruct the jury to

disregard any admission which would not have been made but for a threat of harm.[2] The Judge denied this request and his instructions to the jury failed to make any reference to the confession. The jury was merely given the usual general admonition that it was to determine the facts, adjudicate credibility and weigh the evidence. The jury returned a verdict of guilty after a very brief deliberation.

■■ Barry rests his claim for reversal on the district judge's failure to charge the jury to weigh his admissions in the light of all the surrounding circumstances. Such an instruction is mandated, he contends, by 18 U.S.C. § 3501(a),[3] which states that if the volun-

---

1. Barry testified that one agent "came up to me, looked me right in the face and says: 'You fucking punk, I'm going to kick your ass if you don't start answering questions here' . . . All I saw was his face when he sat down and put it in front of my face and started swearing at me." As the agent spoke, according to Barry, he put his hand on his gun.

2. "If it appears from the evidence in the case that an admission would not have been made, but for some threat of harm or some offer or promise of immunity from prosecution, or leniency in punishment, or other reward, such an admission should not be considered as having been voluntarily made, because of the danger that a person accused might be persuaded by the pressure of hope or fear to confess as facts things which are not true, in an effort to avoid threatened harm or punishment, or to secure a promised reward.

   "If the evidence in the case leaves the jury with a reasonable doubt as to whether an admission was voluntarily made, then the jury should disregard it entirely.

   "The jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."

3. § 3501. Admissibility of confessions

   (a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admit-

ted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

   (b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

   The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

   (c) In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged

tariness of a self-incriminating statement is questioned and the judge determines that the confession was not coerced, then

it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and *shall* instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances. [Emphasis added]

Ordinarily, a defendant may not contest on appeal an omission from the charges unless before the jury retired he "stat[ed] distinctly the matter to which he objects and the grounds of his objection." Fed.R.Crim.P. 30. *See United States* v. *Bynum,* 485 F.2d 490, 503 (2d Cir. 1973), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); *United States* v. *DeKunchak,* 467 F.2d 432, 436 (2d Cir. 1972).[4] Barry objected at trial to the admission of the confession, and to Judge Blumenfeld's

refusal to charge the jury to ignore any admission made under duress. The judge's rejection of this request was, of course, entirely proper. Neither § 3501 nor the constitution mandates that a jury *must* disregard a confession if it believes the confession was coerced, despite a judge's determination that it was voluntary. *See Lego* v. *Twomey,* 404 U.S. 477, 489–90, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).[5]

▆▆ Although it does not afford the defendant a second determination of admissibility, however, § 3501 does unequivocally require a specific charge on the issue of voluntariness. It would be difficult to imagine a clearer imperative than the statutory direction that the judge "*shall* instruct the jury" [emphasis added]. This imperative is not qualified, moreover, by a defendant's denial that he has ever made any inculpatory statements. In the instant case, it appears that Judge Blumenfeld may have wrongly assumed that Barry's claim that he

---

with offenses against the laws of the United States or of the District of Columbia if such *confession* is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

(d) Nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was not under arrest or other detention.

(e) As used in this section, the term "confession" means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing.

Added Pub.L. 90–351, Title II, § 701(a), June 19, 1968, 82 Stat. 210, and amended Pub.L. 90–578, Title III, § 301(a)(3), Oct. 17, 1968, 82 Stat. 1115.

4. We have, of course, found grounds for reversal even where no objection was made when there are deficiencies in the charge, such as the failure to charge an essential element of the offense, which are so serious that they constitute plain error. *United States* v. *DeMarco,* 488 F.2d 828, 832 (2d Cir. 1973); *United States* v. *Fields,* 466 F.2d 119, 121 (2d Cir. 1972); *United States* v. *Pugliese,* 346 F.2d 861, 864 (2d Cir. 1965).

5. Prior to the enactment of § 3501, the procedures followed when voluntariness was challenged varied from circuit to circuit. Some followed the "Massachusetts rule," which required the jury to ignore a confession which it found to be involuntary. *See Hutcherson* v. *United States,* 122 U.S.App.D.C. 51, 351 F.2d 748 (1965); *United States* v. *Inman,* 352 F.2d 954 (4th Cir. 1965).

Others followed the "orthodox rule" under which the jury, once a confession had been admitted into evidence, was not compelled to exclude it from consideration if they thought it coerced, but was instructed to accord the confession such weight as it thought it deserved in light of all the circumstances. *See, e. g., Andrews* v. *United States,* 309 F.2d 127 (5th Cir. 1962), *cert. denied,* 372 U.S. 946, 83 S.Ct. 939, 9 L.Ed.2d 970; *Pon Wing Quong* v. *United States,* 111 F.2d 751 (9th Cir. 1940). Section 3501(a) codified the latter procedure for all Federal courts.

made no damaging admissions eliminated the need to apply the statutory protection offered by § 3501 against the use of statements involuntarily rendered. A defendant may properly claim that he made no incriminating statements and that any statements which the jury might find that he made were coerced. *See Stevenson* v. *Boles,* 331 F.2d 939 (4th Cir.) (per curiam), *modified,* 379 U.S. 43, 85 S.Ct. 174, 13 L.Ed.2d 109 (1964) (per curiam).

The statute's unambiguous language is bolstered by the legislative history of § 3501. That section is a part of Title II of the Omnibus Crime Control and Safe Streets Act of 1968, the major purpose of which, according to the report of the Senate Committee on the Judiciary, 1968 U.S.Code Cong. and Admin.News p. 2112, was to prevent the "rigid, mechanical" exclusion from evidence of *voluntary* confessions solely because the police had not complied with what the committee called the "inflexible requirements of the majority opinion in the Miranda case." *Id.* at 2124, 2132. Congress did not, however, wish to achieve this objective at the price of permitting the unqualified admission of coerced confessions. To forestall this possibility, Congress designed safeguards for the accused. Thus, the committee report stated:

> There is the added safeguard that the jury *must* be instructed to give the confession or statement the weight that they feel it warrants under all the circumstances. The committee feels that society is entitled to the use of confessions and incriminating statements which are admitted *only* after passing the tests of *both* court and jury under the above-described safeguards. The committee also feels that a civilized society could not be more fair to persons accused of crime, as the constitutional rights of defendants in criminal cases would be fully protected

and respected by the safeguards in this proposed legislation. *Id.* at 2137. [Emphasis added]

In short, Congress's unmistakable intent to provide adequate protection against the use of coerced confessions clearly included a desire that the jury play a part in weighing the evidence of duress. This purpose would be subverted if, even in the absence of a proper objection, the jury were not specifically instructed as to the precise nature of its role.[6] We thus conclude that the failure so to charge is plain error. *See United States* v. *Bernett,* 161 U.S. App.D.C. 363, 495 F.2d 943 (1974).

The Government contends, however, that the charge actually given the jury, although it failed to refer *in haec verba* to the issue of voluntariness, nonetheless satisfied the requirements of § 3501(a). It is urged that the court stated:

> Of course, it is not only your task and your duty, but it is your exclusive province to determine what the facts in the case are and, in making that determination, to consider and weigh the evidence.

For several reasons we find that this direction falls short of the statutory mandate. Most significantly, § 3501 itself states that the judge "shall instruct the jury to give such weight *to the confession* as the jury feels it deserves under all the circumstances." [Emphasis added.] It is plain from this provision that Congress contemplated a specific reference to the confession. Indeed, were we to adopt the interpretation suggested by the Government, the entire phrase would become effectively superfluous, since it might be satisfied in any case by the standard boilerplate charge on credibility. But where, as here, such a general charge is not even supplemented by a limiting instruction at the time the evidence is introduced, the jurors are

---

**6.** It is also relevant in this connection that those jurisdictions using the Massachusetts rule had, prior to Congressional consideration of § 3501, held that a failure to charge on voluntariness was plain error. *United States* v. *Inman, supra; Mullins* v. *United States,* 382 F.2d 258 (4th Cir. 1967).

all too apt to conclude that the judge has made a binding determination that the confession was in fact and law voluntary or, perhaps more serious, true. We have previously held that the judge must not disclose to the jury his conclusions as to voluntariness. *United States* v. *Fayette,* 388 F.2d 728, 736 (2d Cir. 1968). And we must recognize that a judge's silence may under some circumstances have as much impact as his words.

■ There is, moreover, an additional factor which independently supports our conclusion that the charge in this case was inadequate. The jury was instructed simply to weigh the evidence in order "to determine what the facts in the case are." As applied to the confession, this direction would restrict the use of evidence regarding voluntariness exclusively to the determination of the trustworthiness of the confession. But the Supreme Court has repeatedly emphasized that a challenge to voluntariness raises a consideration at least as significant as reliability and accuracy: the unfairness involved when "the State . . . by coercion prove[s] its charge against an accused out of his own mouth." *Rogers* v. *Richmond,* 365 U.S. 534, 540–41, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); *Lego* v. *Twomey,* 404 U.S. 477, 484–85, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Jackson* v. *Denno,* 378 U.S. 368, 385–86, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Section 3501 provides that the jury shall "give such weight to the *confession* as the jury feels it deserves under *all* the circumstances." [Emphasis added.] And the Senate Judiciary Committee report emphasized that "a civilized society could not be more fair to persons accused of crime, as the constitutional rights of defendants in criminal cases would be fully protected and respected by the safeguards in this proposed legislation." 1968 U.S.Code Cong. and Admin.News at p. 2137. We would be acting contrary both to the language of the statute and to the intent of Congress were we to exclude the issue of fairness in securing the confession, independently of its reliability, from the ambit of jury considera-

tion. To allow the jury to take fairness into account is not to adopt the rigidity which Congress has condemned, but to implement the very flexibility that it desired; for the jury may still conclude that the reliability of a confession outweighs the fact that it was not entirely voluntary. But that is at least a determination which must be left for the jury's consideration.

Our finding that the district court's charge was inadequate does not conclude our inquiry. We should not order a new trial unless the plain error in the instruction caused "sufficient prejudice to the defendant to justify vitiating the jury's verdict." *United States* v. *Birnbaum,* 373 F.2d 250, 257 (2d Cir. 1967), *cert. denied,* 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99. The yardstick by which prejudice must be measured is our appraisal of the impact of the error on the jury. *Kotteakos* v. *United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). But as *Kotteakos* suggests, a court should be more quick to perceive prejudice "where the departure is from a constitutional norm or a specific command of Congress." *Id.* at 764–65, 66 S.Ct. at 1248.

Given the omission of the plain required language contained in § 3501, we cannot say that the failure to give the required charge was harmless error. The Government provided ample evidence of traffic in amphetamines, but aside from the confession, the only proof that Barry played a part in these transactions was the testimony of Thomas who was awaiting sentence on drug charges, and who alone had face-to-face dealings with Barry. Thomas was, it is true, seen entering the building at 16 Whitman Street where Barry lived. But there was no showing into which of the six apartments Thomas went. Nor was there any evidence besides Barry's admissions which would negate the possibility that Thomas went to 16 Whitman Street, not to collect the amphetamine, but to create the impression that he was a middleman and not the supplier. Sprankle's observation of the defendant

amounts to little, since his only contact with Barry was the latter's request that Sprankle move from his parking space in front of a fire hydrant. We thus "cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error." *Kotteakos, supra,* at 765, 66 S.Ct. at 1248.

Reversed.